Daniel, J.
The prosecution in this case was had under the 4th section of chapter 198 of the Code, by which a fine of thirty dollars is imposed on any free person who, at an ordinary, race-field or other public place, shall play at any game except bowls, chess, backgammon, draughts, or a licensed game. And the specific charge was for playing at an unlawful game, with cards, at the ordinary of Mrs. Mead in Martins- *681 ville in the county of Henry. The playing at a game with cards was proved; but it was not proved that there was any betting on the game, and the issue was narrowed to the enquiry, whether the room in which the playing took place, was in the contemplation of the statute a part of the ordinary.
The establishment of an ordinary may be composed of several houses, or it may be kept in a single house, or in a part of a house; the other portions being held in a different right, and appropriated to an independent business or use.
If we suppose a sale or lease, for the purposes of an ordinary, of a portion only of an establishment, the whole of which, previous thereto, was held-and occupied as a private dwelling, the remaining portion thereof being still retained and occupied by the vendor or lessor as before, for his own exclusive use, it could hardly be maintained in such a case that the vendor or lessor, his family or guests, for a mere playing at cards, in a house or room belonging to the part so retained, could be convicted of gaming at an ordinary.
Without a statute so declaring, would the rule be changed by merely reversing the order, in the holding of the establishment, and supposing that the house or room, though at one time constituting a part of an ordinary, is, at the time of the playing, in the exclusive occupancy of a party, who, under a sale or lease, has in good faith converted such house or room into a private dwelling? I should think not.
In the absence of such a statute, no good reason is perceived why, when the business of the ordinary is conducted in several houses, one or more of them, or, when the ordinary is kept in one house only, one or more of its apartments might not by a sale or lease and an exclusive dedication to other purposes, be to all legal intents severed and disconnected from the ordinary. And (in such a state of the law) the true en *682 quiry in a case of the kind before us would seem to be, not whether at some time previous thereto, the house or room in question constituted a part of the ordinary, or was held as an appendage thereto, or used in connection with it, in the conduct of its business, but whether at the time of the playing such was in truth the case.
If at the time of the playing such house or room be in the occupancy of a party who, having no concern or interest in the business of the ordinary, has honestly bought or leased it and appropriated it to his own private and exclusive use, a conviction for such playing would seem to me to be unwarranted either by the letter or spirit of a law which prohibits such playing only when it takes place at “ an ordinary, race-field or other public place.”
In comparing the 198th chapter of the Code of 1849 with the 147th chapter of the Code of 1819, it will be seen that the two statutes vary from each other materially in their mode of treating the subject under consideration. The act of 1819, after prohibiting the playing at any game except bowls, &c. in an ordinary, &c. in the 5th section, proceeds, afterwards in the 16th section, to declare that every house, out-house, booth, arbor, garden and place within the curtilage of the principal house, tavern, messuage or tenement, or in any wise appurtenant thereto, or at any time held therewith, shall be considered as a part of the tavern, unless the same shall have been bona fide leased to some other person, by deed indented and recorded, &c. But in the act of 1849 there is no declaration as to what shall be deemed and taken to be parts of the ordinary. It is true, that in the 6th and 7th sections of the last mentioned act, a fine is imposed on a keeper of an ordinary or house of entertainment, for permitting unlawful gaming at his house or at any out-house, booth or arbor, or other place appurtenant thereto or held therewith; *683 and it is declared that in a prosecution therefor, if the gaming be proved, it shall be presumed that it was permitted by the keeper of the house, unless it appear that he did not know of or suspect such gaming, or that he endeavored to prevent it, and gave information against the players. And in the 8th section, it is further provided that if the keeper of such a house let or hire to another person any out-house or other place which has been at any time appurtenant to or held with the house kept by him, with intent that unlawful gaming be permitted thereat, he shall suffer the same punishment and incur the same forfeiture as if such unlawful gaming were permitted at his own principal house; and in a prosecution therefor, if the gaming be proved, it shall be presumed that such out-house or other place was let or hired with intent aforesaid, unless the presumption be repelled in the manner mentioned in the 7th section ; which (as we have seen) is by its being made to appear that he did not know of or suspect such gaming, or that he endeavored to prevent it, and gave information against the players. But these sections are obviously pointed at the keeper of the house alone. They make him responsible Tor the offence of unlawful gaming, when committed by other persons at the houses and places mentioned, even though such houses or places be at the time rented out, unless he exculpates himself in the manner indicated; but they do not declare in what the offence of unlawful gaming consists. That offence, whether its illegality arises from the character of the game, or the character of the place at which the game is played, is defined in the preceding section of the chapter. The offence of playing at an unlawful game and the offence of permitting such game to be played by others, are distinct and substantive ofíences; and they are made the subject of distinct and separate sections. Having given the definition of unlawful gaming, and disposed *684 apparently of that offence in distinct and appropriate sections of the chapter, we can hardly suppose, in the absence of plain indications of such an intent, that it was the purpose of the legislature to assign to subsequent sections, devoted in terms to another offence, the task of enlarging by implication the definition of the first mentioned offence. Such a mode of legislating upon the subject would be irregular and illogical, and obviously inconsistent with the general scheme and structure of the statute.
As a means of suppressing the vice of unlawful gaming, and of removing it as far as possible from places of public resort, it was altogether competent and proper for the legislature to enjoin it upon every keeper of an ordinary, as a duty, to give information of all commissions of the offence occurring not only at all places connected with his ordinary and within his control, but also at all places which may have been at any time held with the ordinary, though at the time of the commission of the offence, they may be in the exclusive use and occupancy of persons who under bona fide leases have severed them from all connection with the business of the ordinary; but there arises no necessary implication that in doing this the legislature meant to indicate that a mere playing with cards at any of the places last mentioned, should be deemed and taken as a playing at an ordinary, and so be treated as unlawful gaming.
If it had been the purpose of the legislature to make any distinction between a mere playing with cards at a private house, never held with or in any manner connected with an ordinary, and a like playing at a private house, which, though at some time so held or connected, is at the time of the playing in the occupancy of a tenant in good faith renting and holding it for his own lawful and exclusive use, it is but reasonable to suppose they would have declared such *685 purpose in plain and unambiguous terms. They have made no such declaration; and after allowing to the statute the benefit of the most liberal construction that can be justly claimed for it, in virtue of its character as a remedial law, I have been unable to perceive that the inference of such a purpose is fairly deducible from any of its provisions.
Applying the views thus taken of the law to the facts certified, I am led to the conclusion that the judgment of the Circuit court cannot be sustained. For though the room in which the playing took place (and which was within the same enclosure with the main building, about thirty yards distant from the latter), had at one time been held with and used as an appendage to the tavern, such was not the case at the time of the playing. It was in the exclusive holding and occupancy of the witness Redd, who had rented it for the year as a law office. The fact that he was a boarder at the tavern, makes no difference j by the terms of the renting he was to have the right to hold and occupy the office until the end of the year, whether he continued to board at the tavern or not. His use of the room was not in any wise incidental to, or dependent upon his being a guest or boarder at the tavern, but was enjoyed by force of his rights as tenant. Nor is the case affected by the use of the room above his for the accommodation of the guests of the tavern. It does not appear that the access to that room was through the room in question, and the inference that such was the case is repelled by the consideration that the latter was used by Redd as a law office, and that he had, as is stated in the certificate, the exclusive control over it.
The severance of the room in question, therefore, from the tavern, in tenure, occupancy, use and control, *686 seems to have been complete. Ancl the charge in the presentment is thus, I think, not sustained.
I think the judgment should be reversed, the verdict set aside, and the cause remanded for a new trial.
The other judges concurred in the opinion of Daniel, J.
Judgment reversed.